IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 1:08-cr-504 |
| KEVIN RENDON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Defendant Kevin Rendon is charged with one count of Receiving Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and 2256(8)(A). He moves to suppress physical evidence and statements resulting from a search of his Zune MP-3 player at a military base in Fort Knox, Kentucky that revealed child pornography. Mr. Rendon's MP-3 player was seized during a routine intake procedure. Its contents were examined by his military superiors to check for contraband such as pornography and gang-affiliated material. Among approximately 700 images, the inspection found two pictures containing child pornography. This evidence, along with Mr. Rendon's subsequent statements to the Army's Criminal Investigative Division, ultimately led to a warrant to search his mother's residence in Lorton, Virginia, where authorities found child pornography on Rendon's computer. Because the initial search of the MP-3 player occurred during a military inspection conducted for a military purpose, and was reasonable under the circumstances, the Court DENIES the motion to suppress.

I.      **Background.**

On or about March 31, 2008, Mr. Rendon, then a private in the United States Army, was transferred to the Army base in Fort Knox, Kentucky. The Army had designated Rendon for

release from the military for medical reasons. Upon his arrival at the base, his possessions were collected pursuant to unit regulations. Among these possessions were a cell phone and a "Zune" brand MP-3 player. The standard practice in the unit was to collect electronic devices at the time of the soldier's arrival at the unit and search these devices for contraband such as gang related materials, extremist organization materials, or pornography. The "Drill Sergeant Continuity Book" – a training manual for drill sergeants – provided that during in-processing of a new soldier, "cell phones/ipods" should be "turned on and checked to ensure that [there] are no graphic materials on them such as pornography."

At the hearing, Drill Sergeant Luis Quintana testified that inspecting electronic devices was necessary to prevent contraband material from being disseminated in the barracks. He described the in-processing procedures as follows:

> [I]f there is a device, such as cell phones, MP3 players, i-Pods or anything like that that have downloadable images, we have to screen them for gang-related activity type paraphernalia. Any, what is it called, extremist organization stuff. Any type of pornographic material. Because any of that stuff cannot be spread throughout the barracks and is not in good standing with the military.

Senior Drill Sergeant Duncan Knight testified that "if we find something [on an electronic device], like nudity or gang-related signs or something like that on there, then we take it up to the higher command." Captain Eric Horton, the unit commander, confirmed that soldiers being in-processed were subject to a "straight search" of the contents of electronic devices. He explained that "[w]e make sure that [the electronic devices] work, we make sure that they do not have pornographic materials or gangster material on there because those items are not allowed in

2

our company."

On April 1, 2008, Sergeant Quintana inspected Rendon's MP-3 player and found images of what appeared to be 8-13 year old females wearing minimal clothing and posing in suggestive ways. At the hearing, Quintana could not recall whether he saw pictures containing nudity during this initial inspection, but testified that the lurid nature of the images upset him and that he needed to take a walk to retain his "military bearing." He called Senior Drill Sergeant Knight, who also inspected the images on the MP-3 player. Sergeant Knight testified that he saw several pictures of young girls touching themselves and exposing their private parts. Both sergeants then notified the commanding officer Captain Horton and brought the device to him. Captain Horton contacted the Criminal Investigation Division ("CID"). CID instructed Horton to view the images on the MP-3 player to determine whether any of the images of young girls contained nudity. His examination revealed "one to two pictures of girls that were naked." CID then instructed Horton to bring Rendon and the MP-3 player to CID for questioning.

CID questioned Rendon that day, April 1, and again on April 4, 2008. During questioning, he gave his consent to fully search the player and provided two sworn statements. Based on this information, on April 28, 2008, authorities in Fairfax County obtained a search warrant for Rendon's mother's residence, where the authorities found child pornography on Rendon's computer.

On January 21, 2009, Rendon filed his Motion to Suppress Evidence and Statements. The government filed its response on February 11, 2009. On March 6, 2009, the Court held a hearing on the suppression motion, after which the Court requested additional briefing from the parties on the legal difference between a military inspection and inventory. The parties submitted

3

these briefs on March 20, 2009.

**II.     Discussion.**

**A. Private Rendon had no reasonable expectation of privacy in the contents of his MP-3 player examined during check-in procedures at a military base.**

"The Fourth Amendment does protect members of the armed forces from unreasonable searches and seizures," although "the military's implementation of the fourth amendment protection is different from that employed in civilian matters." *Henson v. United States*, 27 Fed. Cl. 581, 592 (1993) (citing *United States v. Muniz*, 23 M.J. 201, 204 (C.M.A. 1987)). "Servicemen have less expectation of privacy while living on a military installation, and a military commander has considerably more interest in being informed of all activities in the area of his command . . . he has responsibilities for the welfare and combat readiness of personnel under his command." *Henson*, 27 Fed. Cl. at 593 (citing *United States v. Stuckey*, 10 M.J. 347, 349 (C.M.A. 1981)).

"The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant." *United States v. Gray*, 491 F.3d 138, 143-144 (4th Cir. 2007). Demonstrating a reasonable expectation of privacy under the Fourth Amendment "is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361 (1967). "To be legitimate, an expectation of privacy must be objectively reasonable: it must flow from 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Gray*, 491 F.3d at 145. In the military context, the question becomes

4

whether the service-member has a subjective expectation of privacy, and whether that expectation is one that military society would recognize as reasonable. *United States v. Conklin*, 63 M.J. 333, 337 (C.A.A.F. 2006).

Applying this standard here, the Court believes that military society would not recognize a legitimate expectation of privacy in the contents of a portable electronic device brought by a service-member onto a military base, which is examined for contraband during routine in-processing procedures. First, because of the unique demands of military life, soldiers on military bases have diminished privacy expectations. *Henson*, 27 Fed. Cl. at 593. This is particularly true when a soldier is *entering* a military base. The Court of Military Appeals has observed that an entry gate at a base is the functional equivalent of a border for Fourth Amendment purposes. *See United States v. Stringer*, 37 M.J. 120, 126 (C.M.A. 1993). In some ways, the inspection of a soldier's possessions when he arrives on a base is not unlike a border search. The Fourth Circuit has observed that "extensive searches at the border are permitted, even if the same search elsewhere would not be." *United States v. Ickes*, 393 F.3d 501, 502 (4th Cir. 2005).[1] "'The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.'" *Id.* at 505 (quoting *United States v. Flores-Montano*, 124 S. Ct. 1582, 1585 (2004)). Similarly, the military has an interest in preventing the entry of contraband material onto bases and into barracks. At entry points to military installations, more intrusive inspection procedures are warranted because the base command must be able to control its

---

[1] In *Ickes*, for example, customs agents searched Ickes's van at the U.S.-Canada border and found images of child pornography after an extensive search of photo albums, a computer and computer disks found inside the van. *Id.* Ickes had moved to suppress the contents of his computer and disks, and the Fourth Circuit upheld the district court's denial of this motion.

borders and prevent contraband from being imported. *See Stringer*, 37 M.J. at 126. For this to be effective, the military must be able to inspect items that might contain contraband before soldiers enter the barracks.

Given this legal backdrop, from an objective standpoint, a soldier cannot reasonably expect that his personal items will be shielded from examination incident to his arrival at a military base. Private Rendon was a soldier being transferred to a new base; from this fact alone, he either knew or should have known that his possessions would be subject to inspection upon arrival. Thus, the Court finds that any expectation of privacy in the contents of an MP-3 player he brought onto Fort Knox was not one that military society would recognize as reasonable.

Rendon principally relies on *United States v. Conklin*, in which the Court of Appeals for the Armed Forces (CAAF) held that a service-member sharing a two-person dormitory room has a reasonable expectation of privacy in the files stored on the hard drive of his personal computer. 63 M.J. 333, 337 (C.A.A.F. 2006). *Conklin*, however, is distinguishable. That case involved a search of a soldier's personal computer in a shared dormitory room, whereas Rendon's MP-3 player was searched incident to his arrival at the base. As explained above, the fact that Rendon was a soldier entering a military base substantially diminishes – if not defeats – any legitimate expectation of privacy in his personal effects. Furthermore, the inspection of Conklin's room was conducted under base regulations authorizing only a "neat and orderly" inspection. *Id.* The *Conklin* court expressly "voice[d] no opinion today regarding a situation where regulations dealing with personal computers, barracks use, and privacy interests might exist." 63 M.J. at 337, n.26. In this case, the in-processing procedures detailed in the Drill Sergeant Continuity Handbook explicitly authorized a broad inspection of all electronic devices for contraband

6

material such as pornography.

The Court therefore holds that Rendon had no reasonable expectation of privacy in the contents of the MP-3 player that the military inspected when he arrived at the base.

**B. The child pornography on Rendon's MP-3 player was discovered during a valid military inspection.**

The military did not violate the Fourth Amendment because the examination of Rendon's MP-3 player was a valid military inspection conducted for a military – not law enforcement – purpose. In general, military commanders have broad authority to inspect persons and items under their command to ensure good order and discipline in the military unit. "[T]he military search authorization procedure is a finely tuned accommodation of the servicemember's privacy interests grounded in the fourth amendment and the specific needs, dictated by military necessity, for good order and discipline in the armed forces." *Henson*, 27 Fed. Cl. at 593 (citing *United States v. Chapman*, 954 F.2d 1352, 1369 (7th Cir. 1992)). Military law recognizes a type of examination called an "inspection," which is "an intrusion for the purpose of allowing a commander to examine all places within his or her command, including areas where individual service members have a reasonable expectation of privacy." Military Criminal Law Evidence, Chapter 22-8(a)(2), *Administrative Intrusions* (1987); *United States v. Middleton*, 10 M.J. 23, 27 (C.M.A. 1981) ("[W]e have long acknowledged that the inspection has traditionally been a 'tool' for a commander to use in ensuring 'the overall fitness of (his) unit to perform its military mission."). Military Rule of Evidence 313(b) defines "inspection" as "an examination of the whole or part of a unit . . . including an examination conducted at entrance and exit points, conducted as an incident to command the primary purpose of which is to determine and ensure

7

the security, military fitness or good order and discipline of the unit." Mil. R. Evid. 313(b).

A military "inspection" is not the same thing as a "search" under the Fourth Amendment. The primary difference between the two is the purpose for the examination. "Inspections differ from searches in that their primary purpose is to determine or to ensure the fitness of the command." Military Criminal Law Evidence, Chapter 22-8(a)(2). An inspection may have a dual or mixed purpose, such as uncovering evidence of a crime, so long as the *primary* purpose is to ensure the security, military fitness or good order and discipline of the command. *Id.* (citing Mil. R. Evid. 313(b)); *United States v. Barnett*, 18 M.J 166 (C.M.A. 1984). Further, evidence of a crime found during an inspection may be used against the soldier in criminal proceedings. *United States v. Tates*, 50 C.M.R. 504, 507 (A.C.M.R. 1975) ("Evidence of crime discovered in the course of such inspections may be offered properly against a person subject to the Code.").

By contrast, a search is an examination conducted for the primary purpose of finding and seizing evidence to be used in a criminal prosecution. *See* Military Criminal Law Evidence, Ch. 22-8(a)(2); *see also Middleton*, 10 M.J. at 131 n.13 (discussing prior version of Mil. R. Evid. 313(b)). Rule 313(b) further provides that "an examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in any other disciplinary proceeding is not an inspection within the meaning of the rule." Mil. R. Evid. 313(b). "[I]f an intrusion on privacy is really an 'inspection' and complies with Mil. R. Evid. 313, no reasonable expectation of privacy has been violated; but if the purported inspection is only a subterfuge for a search or is not properly conducted, then a violation has occurred." *United States v. Thatcher*, 28 M.J. 20, 24 (C.M.A. 1989).

A third type of examination is called an "inventory." Although the Military Rules of

8

Evidence do not precisely define "inventory," in common usage it means to create a formal list of property. *See, e.g.,* Webster's New Collegiate Dictionary, at 446 (7th ed. 1970). An inventory of property in military custody may be justified to safeguard the property, protect the government against claims arising from loss or theft, and protect government personnel against potential hazards from dangerous substances. *United States v. Hines,* 5 M.J. 916 (A.C.M.R. 1978), *aff'd by,* 11 M.J. 88 (C.M.A. 1981).

Matching these standards with the facts developed at the hearing, the Court holds that Rendon's MP-3 player initially was seized during a lawful inventory, and that the examination of its electronic contents was an inspection conducted for a military purpose. The initial seizure of Rendon's cell phone and MP-3 player occurred incident to his arrival during in-processing procedures that applied even-handedly to every soldier arriving at the base. Sergeant Quintana explained the procedure at the hearing:

> When we take electronic equipment, what happens with it is we put it in a log, we mark it down with serial numbers, model numbers, and we lock it in a wall locker. And we ensure that it is tagged with their name, put it in the bins, we lock the wall locker, and then we lock the door that the wall locker is in.

Both Sergeant Knight and Captain Horton corroborated Quintana's description of this procedure. This description fits the common use of an "inventory" in military law. *See Hines,* 5 M.J. 916.[2]

---

[2] It could be argued that simply locking up the MP-3 player would have been sufficient to prevent contraband from entering the unit. The Court finds that inspecting the contents of electronic devices at the soldier's point of entry was a valid military exercise done for the purpose of keeping contraband out of the unit. Electronic devices regularly are admitted into the barracks at a later time, as demonstrated in the *Conklin* case. *See supra.* The inspection-upon-entry regime therefore was a reasonable means to ensure the "security, military fitness or good order and discipline of the command." Mil. R. Evid. 313(b).

9

Moreover, the examination of the contents of the MP-3 player was a valid military inspection. As noted, the touchstone of this inquiry is the purpose for the examination. *Thatcher*, 28 M.J. at 24. First, all three military witnesses testified that the purpose of the examination was to find "contraband" material, *e.g.*, gang-related material and pornography, which was not allowed in the unit. Sergeant Quintana testified that such material "cannot be spread throughout the barracks and is not in good standing with the military." Captain Horton explained that "we make sure that [the devices] do not have pornographic materials or gangster material on there because those items are not allowed in our company." The in-processing procedures detailed in the Continuity Book explicitly stated that the purpose for checking the contents of the soldiers' devices was to "ensure that [there] are no graphic materials on them such as pornography."[3] There can be no doubt that the military has a valid interest in preventing the importation of contraband materials onto the base.[4]

Furthermore, rather than singling out Rendon based on suspicion of criminal activity, the drill sergeants examined his MP-3 player pursuant to in-processing protocol that equally applied to every soldier entering the unit. An inspection of all entering soldiers, conducted pursuant to pre-existing protocol, is categorically different from a search aimed at uncovering evidence of

---

[3] The Court is aware that the Continuity Book and witnesses at the hearing described the examination of the MP-3 player's contents as an "inventory" rather than "inspection." However, the fact that the soldiers and Continuity Book used the term "inventory" is of no legal moment. What matters under the Fourth Amendment analysis is the purpose for the examination and manner in which it was conducted, not what the examiners labeled it. *Thatcher*, 28 M.J. at 24 n.3 ("what is reasonable depends upon the circumstances of the intrusion").

[4] Additionally, Rendon's possessions were inventoried and inspected incident to his arrival at the base and entrance into a new unit. Rule 313(b) provides that an inspection "can include an examination conducted at entrance and exit points." Mil. R. Evid. 313(b).

criminal activity. Here again, the Continuity Book specified that electronic devices should be checked for contraband during in-processing and that each soldier's "cell phones/ipods" should be "turned on and checked to ensure that [there] are no graphic materials on them such as pornography." There is no evidence that Rendon was singled-out for a search or that the initial inspection of the contents of his MP-3 player was based on suspicion of criminal activity. To be sure, after Sergeant Quintana inspected the device he developed a suspicion that it might contain prohibited materials. Sergeant Knight, who inspected the MP-3 player next, testified that he saw nudity in some of the images, and Captain Horton's inspection confirmed the presence of child pornography. But the fact that an inspection uncovers evidence of a crime does not convert an inspection into a "search" under the Fourth Amendment. *Tates*, 50 C.M.R. at 507; *Thatcher*, 28 M.J. at 24.

## C. The inspection of Rendon's MP-3 player was reasonable.

A military inspection "may be transformed into a search requiring probable cause if it was conducted as a subterfuge for a search . . . or was conducted in an unreasonable manner." *United States v. Ellis*, 24 M.J. 370, 372 (C.M.A. 1987). "The reasonableness of an inspection is determined by whether the inspection is conducted in accordance with the commander's inspection authorization, both as to the area to be inspected . . . and as to the specific purposes set forth by the commander for ordering the inspection." *Id.* Even where there is no written authorization for an inspection, its reasonableness can be established where the "purpose, scope, and particulars [are] shown with sufficient definiteness." *Stringer*, 37 M.J. at 126. Moreover, as explained above, inspections conducted near entrance points to military installations are analogous to border inspections and generally are considered reasonable. *Id.* (citing *United*

11

*States v. Ramsey*, 431 U.S. at 616).

Here, the drill sergeants conducted the inspection of Rendon's MP-3 player in accordance with pre-existing, written authorization from the unit command. Both the Continuity Book and directives from Captain Horton provided sufficient particulars as to the purpose and scope of the inspection. Drill sergeants were authorized to turn on electronic devices and check them for three specific types of contraband: gang-related materials, extremist organization materials, and pornography. The authorized scope of the inspection was reasonable. The sergeants were not given authority to examine the contents of every item inventoried, but rather were limited to electronic items. These electronic items could not be inspected for anything at all – the inspection was limited to specifically-defined contraband material. At no point did the drill sergeants or Captain Horton exceed the parameters of the inspection. The inspection of Rendon's possessions did not exceed the scope of this authorization; the soldiers were authorized to search electronic devices for contraband material like pornography, and that is what they did.

Nor did the military violate the Fourth Amendment by inspecting the MP-3 player some time after seizing it upon his arrival.[5] "Where the initial intrusion is lawful, a decision to postpone further search into a properly seized item until it has been brought to a more private and secure place does not render the subsequent, more detailed search of the same item constitutionally impermissible." *United States v. Venizelos*, 495 F. Supp. 1277, 1280 (S.D.N.Y. 1980) (citing *United States v. Muhammad*, 432 F.2d 1046, 1047 (2d Cir. 1970)); *see also United States v. Finley*, 477 F.3d 250, 260 n.7 (5th Cir. 2007) ("as long as the administrative processes

---

[5] That the MP-3 player may have been inspected up to a day after Rendon's arrival is of no moment, as it clearly was seized upon his entry onto the base and held continuously until the sergeants inspected it.

incident to the arrest and custody have not been completed, a search of effects seized from the defendant's person is still incident to the defendant's arrest").

**D. The child pornography on Rendon's home computers inevitably would have been discovered.**

Rendon argues that Captain Horton's examination of the MP-3 player was for a law enforcement purpose and thus he was required to obtain a warrant. This is incorrect for two reasons. First, Captain Horton's examination of the MP-3 player was for a military purpose; his purpose was to verify that it indeed contained pornographic material, which was prohibited in the unit. Surely the base commander – under whose authority the drill sergeants act – is allowed to enforce unit regulations by conducting his own inspection to verify what his sergeants uncovered. Further, the mere fact that he called CID for guidance does not transmute his military purpose into a criminal investigative one. *United States v. Banks*, 44 C.M.R. 878, 881 (A.F.C.M.R. 1972) ("An inspection valid at its inception is not transformed into an illegal proceeding simply because one of the persons subject to inspection becomes the subject of a criminal investigation").

Moreover, assuming *arguendo* that Captain Horton's inspection was for a law enforcement purpose, Sergeant Knight already had discovered child pornography on the MP-3 player. The proverbial cat was out of the bag. Even without Captain Horton's inspection, then, Sergeant Knight still would have confirmed the presence of child pornography to CID; CID still would have seized the device and interviewed Rendon; and Rendon presumably still would have admitted to possessing child pornography on his home computers and thereby given authorities probable cause for the warrant. Thus, the Court finds by a preponderance of the evidence that the

13

discovery of child pornography on Rendon's home computers was inevitable. *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987) ("[W]here it appears that evidence 'inevitably would have been discovered by lawful means,' the deterrence rationale of the exclusionary rule has 'so little basis' that the rule should not be applied.") (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

**IV.    Conclusion.**

For the reasons stated above, the Motion to Suppress shall be denied.  The Court shall enter an appropriate order forthwith.

/s/

Liam O'Grady
United States District Judge

Entered this 21st day of April, 2009.

Alexandria, Virginia

14